FILED

2022 May-13  AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

**SCHRADE JONES** and **CARTER GILLIAM,**

*Plaintiffs*,

**v.**                                           **Case No.**_____

**UNITED STATES OF AMERICA** and **TENNESSEE VALLEY AUTHORITY,**

*Defendants*.

_____

## COMPLAINT
_____

Plaintiffs Schrade Jones and Carter Gilliam complain of the defendants as follows.

## PARTIES

1.     Plaintiff Schrade Jones is an adult resident of Jackson County, Alabama.

2.     Plaintiff Carter Gilliam is an adult resident of Jackson County, Alabama.

3.     Defendant United States of America is, and at all times mentioned was, owner of the land upon which the hazardous structure, discussed below, was affixed.

4.     Defendant Tennessee Valley Authority ("TVA") is a federally chartered corporation created in 1933 by the TVA Act, 16 U.S.C. § 831, *et seq*. The

1

TVA controlled and was entrusted with the navigable waterway in the area where the incident complained of herein occurred and/or the land upon which the hazardous structure, discussed below, was affixed.

## JURISDICTION AND VENUE

5.     The Suits in Admiralty Act, 46 U.S.C. §§ 30901-30913 ("SIAA"), waives the United States' sovereign immunity for maritime and admiralty actions. It provides: "In a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty in personam may be brought against the United States or a federally-owned corporation." 46 U.S.C. § 30903(a).

6.     The TVA Act provides: "Except as otherwise specifically provided in this chapter [the Tennessee Valley Authority Act of 1933], the [TVA] . . . [m]ay sue and be sued in its corporate name." 16 U.S.C. § 831c(b). This "sue-and-be-sued clause serves to waive sovereign immunity otherwise belonging to an agency of the Federal Government." *Thacker v. Tennessee Valley Authority*, 139 S.Ct. 1435, 1440 (2019).

7.     This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears. This court has jurisdiction under 28 U.S.C. § 1333 and 28 U.S.C. § 1331 as the incident complained of occurred upon navigable waters and the claims

arise under the federal general admiralty and maritime law. Further, "[t]he judicial Power shall extend . . . to all Cases of admiralty and maritime Jurisdiction . . ." U.S. Const. art. III, § 2.

8.      Plaintiffs elect to have this suit proceed in personam.

9.      Venue is proper in the U.S. District Court for the Northern District of Alabama pursuant to 46 U.S.C. § 30906(a) and 28 U.S.C. §§ 1391(b) and (c) because the plaintiffs reside in the Northern District of Alabama; a substantial part of the events or omissions giving rise to the claim occurred in said district; and TVA maintains its principal office in the immediate vicinity of said district and "shall be held to be an inhabitant and resident of the Northern Judicial District of Alabama within the meaning of the laws of the United States relating to the venue of civil suits." 16 U.S.C. § 831g(a).

10.     Plaintiffs have complied with all administrative claim prerequisites. On November 8, 2021, Plaintiffs mailed a written claim for the damages alleged in this complaint to the federal government and TVA. The written claim was received by the government and TVA on or before November 12, 2021. The written claim was either denied or more than six months have passed since the claim was presented without response.

## FACTUAL ALLEGATIONS AND LEGAL BACKGROUND

**I.     The Tennessee River, the TVA, and Lake Guntersville**

11.     The Tennessee River is the largest tributary of the Ohio River. It is approximately 652 miles long and is in the Tennessee Valley of the southeastern United States. It begins in the Appalachian Mountains of Tennessee and flows in a southwesterly direction into the northeastern corner of Alabama, through Jackson County, Alabama, before continuing westward across the state, back up through Tennessee, and into Kentucky before eventually emptying into the Ohio River.

12.     The Tennessee River has long been used as a navigable waterway, is navigable in fact, and it is used, or is susceptible to being used, as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

13.     Prior to 1939, the Tennessee River was prone to heavy flooding. To help alleviate that problem and help spur economic development in the area, Congress created the TVA in 1933 through the TVA Act, 16 U.S.C. § 831, *et seq*. The preamble to the TVA's enabling legislation says:

> For the purpose of maintaining and operating the properties now owned by the United States in the vicinity of Muscle Shoals, Alabama, in the interest of national defense and for agricultural and industrial development, and to improve navigation in the Tennessee River and to control the destructive flood waters in the Tennessee River and Mississippi River Basins, there is hereby created a body corporate by the name of the "Tennessee Valley Authority" (hereinafter referred to as the "Corporation").

4

TVA Act of 1933, Pub. L. No. 73-17, 48 Stat. 58 (1933); 16 U.S.C. § 831 (Preamble).

14.   Congress gave the TVA all "such powers as may be necessary or appropriate for the exercise of the powers herein specifically conferred upon the Corporation." 16 U.S.C. § 831c(g). Those powers included the ability to purchase or condemn land in the name of the United States. *See* 16 U.S.C. §§ 831c(f) and (i). "In order to enable the Corporation to exercise the powers and duties vested in it by this chapter . . . <u>exclusive use, possession, and control of . . . property</u> to be acquired by the Corporation in its own name or in the name of the United States of America, <u>are entrusted to the Corporation for the purposes of this chapter</u>." 16 U.S.C. § 831f(a).

15.   The TVA was also given the "power to construct such dams, and reservoirs, in the Tennessee River and its tributaries" and was instructed to "<u>best serve to promote navigation on the Tennessee River and its tributaries</u> and control destructive flood waters in the Tennessee and Mississippi River drainage basins . . ." 16 U.S.C. § 831c(j). The TVA was further "directed in the operation of any dam or reservoir in its possession and control to regulate the stream flow primarily for the purposes of promoting navigation and controlling floods." 16 U.S.C. § 831h-1. The TVA's board of directors are required to "ensure that all activities of the Corporation are carried out in compliance with applicable law." 16 U.S.C. § 831a(g)(1).

16.    The TVA began exercising its powers soon after its creation in contemplation of building what would eventually be the Guntersville Dam. The TVA, in the name of the United States, purchased property in Jackson County on the banks of the Tennessee River. This included a piece of property owned by Kyle and Beulah Kollock in Township 5 South, Range 5 East, Section 33 of the Huntsville Meridian in Jackson County, which was purchased by the United States on November 4, 1936.

17.    The TVA completed the Guntersville Dam in January 1939, thereby flooding the properties upstream, including the former Kollock property, and creating Lake Guntersville.

18.    Thus, the federal government owns the riverbed under the Tennessee River where the former Kollock property is located.

## II.   The Federal Government's Control over Navigable Waters

19.    The federal government has authority over all navigable waterways under the Constitution's Commerce Clause. Indeed, the Supreme Court has said:

> The Commerce Clause confers a unique position upon the Government in connection with navigable waters. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States. For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress. This power to regulate navigation confers upon the United States a "dominant servitude," where extends to the entire stream and the stream bed below ordinary high-water mark.

*United States v. Rands*, 389 U.S. 121, 122-123 (1967) (internal citations omitted).

20.     The pervasive nature of Congress's regulatory authority over national

waters has also been described as follows:

> In our view, it cannot properly be said that the constitutional power of the United States over its waters is limited to control for navigation. . . . In truth the authority of the United States is the regulation of commerce on its waters. Navigability . . . is but a part of this whole. Flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control. . . . [The] authority is as broad as the needs of commerce. . . . The point is that navigable waters are subject to national planning and control in the broad regulation of commerce granted the Federal Government.

*United States v. Appalachian Power Co.*, 311 U.S. 377, 426-427 (1979). Moreover,

> Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a State other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress. This necessarily includes the power to keep them open and free from any obstruction to their navigation, interposed by the States or otherwise; to remove such obstructions when they exist; and to provide, by such sanctions as they may deem proper, against the occurrence of the evil and for the punishment of offenders.

*Gilman v. City of Philadelphia*, 70 U.S. 713, 724-725 (1865).

## III. The General Maritime Law and the Government and TVA's Joint Responsibility for the Tennessee River

21.     In admiralty cases, unless there is "a relevant statute, the general

maritime law, as developed by the judiciary, applies." *East River S.S. Corp. v.*

*Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986). "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *Id.*

22.     The general maritime law imposes a duty to exercise reasonable care, which includes the duty to warn of foreseeable dangers. *See, e.g.*, *Bubla v. Bradshaw*, 795 F.2d 349, 353 (4th Cir. 1986) ("The duty of ordinary care includes, of course, a duty to warn of harm that is reasonably foreseeable under the circumstances."); *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980) ("In analyzing a maritime tort case, we rely on general principles of negligence law."); Schoenbaum, *Admiralty & Maritime Law* § 5–2 ("A duty of care exists when injury is foreseeable.").

23.     Numerous courts, including the U.S. Supreme Court, have held that the general maritime law imposes a duty to warn of obstructions in navigable waterways. *See, e.g.*, *Smith v. Burnett,* 173 U.S. 430 (1899) (noting that wharfingers must exercise reasonable diligence in determining the safety of their berths, a duty which requires them to remove any dangerous obstruction in a berth "or to give due notice of its existence to vessels about to use the berths"); *Sutton v. Earles*, 26 F.3d 903 (9th Cir. 1994) (holding that the government had a duty to warn recreational boaters about a mooring buoy placed by the government within the waters of a naval base that was open to public use); *Dye v. United States*, 210 F.2d 123, 128 (6th Cir.

1954) ("Although the dam was constructed under lawful authority, a duty rested upon the operator of the dam to give adequate warning of a dangerous condition, when existing, and the failure to do so would impose liability upon the operator."); *Cumberland County Utilities Auth. v. The M/T Delbar,* 604 F.Supp. 383, 389 (D.N.J. 1985), *aff'd,* 930 F.2d 916 (5th Cir. 1991) ("The plaintiff, as owner of a structure which extends into a navigable waterway, has a duty to adequately mark such structure. Failure to do so with an appropriate warning is negligence."); *Doty v. United States*, 531 F.Supp. 1024, 1034 (N.D. Ill. 1982) ("As owner and operator of Lock and Dam 13 the Corps [of Engineers] (and therefore the United States) had a duty to warn users of the Mississippi River that it is dangerous to approach too near to the dam."); *Ranger Ins. Co. v. Exxon Pipeline Co.,* 760 F.Supp. 97, 98-99 (W.D. La. 1990) ("A prudent pipeline owner or operator should warn of the crossing of a pipeline. . . . Moreover, if [the defendant] maintains a pipeline above the mud line, it has a further duty to warn of this potential obstruction to navigation.").

24.     A maritime duty of care can also arise from a statute or regulation. *See Southern Nat. Gas Co. v. Pontchartrain Materials, Inc*., 711 F.2d 1251, 1255-56 (5th Cir. 1983); Schoenbaum, *Admiralty & Maritime Law* § 5–2 ("In admiralty the duty of care may be derived from . . . duly enacted laws, regulations, and rules").

25.     By statute, Congress has made the federal government responsible for maintaining federally controlled navigable waterways. This responsibility has been

delegated to the Secretary of the Army, who has further delegated specific responsibilities to the Coast Guard and Army Corps of Engineers. *See* 33 U.S.C. § 1 (establishing that the Secretary of the Army has the power to regulate navigable waterways and may delegate this responsibility to governmental agencies as the Secretary sees fit).

26.     Congress has specifically mandated that the Coast Guard "<u>shall</u>

(1)  <u>enforce or assist in the enforcement of all applicable Federal laws</u> on, under, and over the high seas and waters subject to the jurisdiction of the United States;

(2)  engage in maritime air surveillance or interdiction to enforce or assist in the enforcement of the laws of the United States;

(3)  <u>administer laws and promulgate and enforce regulations for the promotion of safety of life</u> and property on and under the high seas and waters subject to the jurisdiction of the United States, covering all matters not specifically delegated by law to some other executive department;

(4)  <u>develop, establish, maintain, and operate</u>, with due regard to the requirements of national defense, <u>aids to maritime navigation</u>, icebreaking facilities, and rescue facilities <u>for the promotion of safety</u> on, under, and over the high seas and waters subject to the jurisdiction of the United States."

14 U.S.C. § 102. Those laws include those in the Rivers and Harbors Act, which prohibit the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." 33 U.S.C. §§ 403 and 403a.

27.    Moreover, by regulation, the "Coast Guard administers the U.S. Aids to Navigation System. The system consists of Federal aids to navigation operated by the Coast Guard, aids to navigation operated by the other armed services, and private aids to navigation operated by other persons." 33 C.F.R. § 62.1(a). "The term aid to navigation means any device external to a vessel or aircraft intended to assist a navigator to determine position or safe course, or to warn of dangers or obstructions to navigation." 33 C.F.R. § 62.3(a).

28.    The Coast Guard's *Aids to Navigation Manual* also provides:

(1)  Coast Guard aids to navigation are established, insofar as is practicable within the limitations of the lateral system, to mark channels and other areas of "safe water." In those areas, which have rocks and shoals scattered throughout, the marking of safe water may be of necessity by the marking of the dangers. Where several channels, equally accessible and of similar size and depth, exist in the same area, special care must be exercised to avoid the placement of aids where they might mislead the mariner.

. . .

(3)  Coast Guard aids to navigation are used to mark hazards to navigation, wrecks and obstructions.

29.    The objectives of the aids to navigation are developed, established, operated and maintained by the Coast Guard to assist the navigator in determining a safe course and warn the navigator of dangers and obstructions.

30.    The Coast Guard may also "mark for the protection of maritime navigation any structure, sunken vessel or other obstruction." 33 C.F.R. § 64.33.

31.    The Coast Guard and TVA work together to keep buoys, daymarks, and other Tennessee River system navigation aids accurate and in excellent condition. Navigation aids on the commercial navigation channel are maintained by the Coast Guard, while those on the secondary channels and tributary reservoirs are maintained by TVA.

32.    The Corps of Engineers regulates any construction or excavation within the navigable waters of the United States, 33 U.S.C. § 403, and its regulatory jurisdiction "extend[s] laterally to the entire water surface and bed of a navigable waterbody, which includes all the land and waters below the ordinary high water mark," 33 C.F.R. § 329.11.

33.    The Corps is authorized to remove objects that are hazards to navigation, 33 C.F.R. § 245.10, and is responsible for ensuring that information concerning any changes in navigable waterways, such as an obstruction therein, are promptly publicized for the benefit of the maritime community, 33 C.F.R. § 209.325.

34.    In disseminating such information, the Corps regularly produces navigational charts and maps to aid mariners, and it published maps in 2013 of the subject area. *See* U.S. Army Corps of Engineers, *Tennessee River Navigation Charts; Paducah, Kentucky to Knoxville, Tennessee* (Jan. 2013).

35.    In 1962, the Department of the Army/Corps of Engineers and the TVA executed a memorandum of agreement related to their respective obligations for the

Tennessee River. That memorandum provided that the TVA was "responsible for the maintenance of channels and harbors primarily required for recreational[] purposes," and the Department of the Army (and thus the Corps of Engineers) had "primary responsibility for . . . performing work of an operational and maintenance nature. This includes . . . maintenance of the main navigation channel and safety harbors together with the channels in connection therewith."

36.    In addition to the TVA Act's provisions set forth above, the "TVA's approval must be obtained prior to the construction, operation, or maintenance of any dam, appurtenant works, or other obstruction affecting navigation, flood control, or public lands or reservations along or in the Tennessee River or any of its tributaries." 18 C.F.R. § 1304.1.

## IV.  The Duck Blind and the Incident

37.    At some point in or before 2006, a structure was placed in the middle of the Tennessee River/Lake Guntersville in or near the main channel at 33°33'36.00"N, 86°06'41.10"W, more or less, in Jackson County, Alabama. That structure, hereinafter referred to as the "duck blind"[1] is affixed to the riverbed owned by the United States that was purchased from Kyle and Beulah Kollock.

38.    Despite existing since at least 2006, that duck blind is not present on any Corps of Engineers map, despite that area having been mapped by the Corps in

---

[1] A duck blind is a shelter, often camouflaged, for concealing duck hunters.

2013. Further, upon information and belief, the duck blind has never been marked with a light, reflective materials, or buoys, and it was not so marked on June 5, 2020.

39.     On the night of June 5, 2020, Schrade Jones and Carter Gilliam went bowfishing on Lake Guntersville in Schrade's 16-foot aluminum hull jon boat, which was purchased only a week or so before the incident.

40.     Bowfishing is a method of fishing where fish are shot with a barbed arrow that is attached with special line to a reel mounted on the bow. The fish are shot and reeled in. Bowfishing is most often done at night using spotlights that shine down into the water to see the fish. Bowfishing is popular on the Tennessee River and Lake Guntersville, and tournaments are periodically held on the lake with people from all over the country traveling to Jackson County to compete.

41.     Schrade and Carter left Schrade's house after sunset and were out on the water in Schrade's boat by 9 pm. It was partially cloudy that evening, with little to no natural light. They began bowfishing from Schrade's boat on the western bank of the river. Having little luck, Schrade and Carter wanted to try another spot near the eastern bank of the river. With a navigational running light on the front of their boat, Schrade and Carter started going across the river at approximately 25 miles per hour. Carter was driving the boat while Schrade sat in the front.

42.     Both were looking around at their surroundings, but the unmarked and unlit duck blind could not be seen because it blended-in with the water and darkness.

Schrade and Carter also did not expect an unmarked structure to be in the middle of a regulated and maintained navigable waterway only feet from the main channel marked for commercial boat traffic.

43.     Without prior notice or an ability to see the dark and camouflaged duck blind, Schrade and Carter's boat crashed into the duck blind. Schrade hit the duck blind and Carter's body was thrown forward into Schrade. Both Carter and Schrade were knocked completely unconscious.

44.     Carter awoke in the boat in a daze with Schrade, still unconscious, on top of him. Carter pushed Schrade off and tried to wake him, but Schrade did not respond. Carter thought Schrade was dead and started doing CPR. Schrade woke moments later. Both were in excruciating pain and were seriously injured and damaged.

## COUNT ONE
## NEGLIGENCE UNDER THE GENERAL MARITIME LAW

45.     The duck blind was affixed to federally owned property in the middle of a navigable waterway that was subject to the federal government's dominant navigable servitude. The area was maintained and overseen by the TVA, Coast Guard, and Army Corps of Engineers.

46.     The general maritime law imposed a duty on the United States and TVA to exercise reasonable care under the circumstances, including a duty to warn of foreseeable dangers and obstructions in navigable waterways.

47.     The duck blind was a hazardous obstruction to navigation, and it was foreseeable that it could cause a wreck and injuries to boaters like Schrade and Carter.

48.     As such, the United States and TVA had a duty to remove the obstruction or warn boaters of it with sufficient intensity to permit boaters to alter their course of travel to avoid the hazard.

49.     The United States and TVA had an opportunity and sufficient time to remove or give adequate warning of the hazard. Indeed, the duck blind had existed in the navigable waterway since at least 2006, and both the TVA and federal government through the Coast Guard and Corps of Engineers all had oversight responsibilities and performed operations in the general area prior to the incident.

50.     The United States and TVA failed to exercise reasonable care under the circumstances. The United States and TVA failed to remove, give adequate warning of, or reasonably mark the hazard in breach of their general maritime law duty to act with reasonable care under the circumstances, which included a duty to warn of foreseeable dangers and obstructions in navigable waterways.

51.     As a direct, proximate, and/or combining and concurring result of United States and TVA's negligent actions and inactions, Schrade and Carter were seriously injured and damaged.

52.     Schrade's injuries include, but are not limited to:

a.  Facial and jaw fractures;

b.  A spine fracture;

c.  Rib fractures;

d.  Hand fracture;

e.  Broken teeth;

f.  A concussion;

g.  A laceration requiring 18 staples, as well as other cuts and bruises;

h.  Separation/tearing of muscles;

i.  Physical pain, disability, and disfigurement;

j.  Mental anguish and emotional distress;

k.  Schrade incurred medical bills;

l.  Schrade will need future medical treatment and he will incur future medical bills;

m. Lost wages;

n.  Loss of enjoyment of life; and

o.  Permanent injuries and limitations.

53.    Carter's injuries include, but are not limited to:

a.  Facial fractures;

b.  Scapula acromion process fracture;

c.  Torn shoulder tendon;

    d.  A concussion;

    e.  Lacerations that required staples and stitches, as well as other cuts and bruises;

    f.  Physical pain, disability, and disfigurement;

    g.  Mental anguish and emotional distress;

    h.  Carter incurred medical bills;

    i.  Carter will need future medical treatment and he will incur future medical bills;

    j.  Lost wages;

    k.  Loss of enjoyment of life; and

    l.  Permanent injuries and limitations.

54.    The United States and TVA are liable for Schrade and Carter's injuries for their negligent actions and inactions. Further, the United States is liable for the TVA's negligent actions and inactions pursuant to the doctrines of respondeat superior and/or vicarious liability.

## COUNT TWO
## <u>WANTONNESS UNDER THE GENERAL MARITIME LAW</u>

55.    The duck blind was affixed to federally owned property in the middle of a navigable waterway that was subject to the federal government's dominant navigable servitude. The area was maintained and overseen by the TVA, Coast Guard, and Army Corps of Engineers.

56.     The general maritime law imposed a duty on the United States and TVA to exercise reasonable care under the circumstances, including a duty to warn of foreseeable dangers and obstructions in navigable waterways.

57.     The duck blind was a hazardous obstruction to navigation, and it was foreseeable that it could cause a wreck and injuries to boaters like Schrade and Carter.

58.     As such, the United States and TVA had a duty to remove the obstruction or warn boaters of it with sufficient intensity to permit boaters to alter their course of travel to avoid the hazard.

59.     The United States and TVA had an opportunity and sufficient time to remove or give adequate warning of the hazard. Indeed, the duck blind had existed in the navigable waterway since at least 2006, and both the TVA and federal government through the Coast Guard and Corps of Engineers all had oversight responsibilities and performed operations in the general area prior to the incident.

60.     The United States and TVA wantonly and/or recklessly failed to exercise reasonable care under the circumstances. The United States and TVA wantonly and/or recklessly failed to remove, give adequate warning of, or reasonably mark the hazard in breach of their general maritime law duty to act with reasonable care under the circumstances, which included a duty to warn of foreseeable dangers and obstructions in navigable waterways.

61.    As a direct, proximate, and/or combining and concurring result of United States and TVA's wanton and/or reckless actions and inactions, Schrade and Carter were seriously injured and damaged.

62.    Schrade's injuries include, but are not limited to:

    a.  Facial and jaw fractures;

    b.  A spine fracture;

    c.  Rib fractures;

    d.  Hand fracture;

    e.  Broken teeth;

    f.  A concussion;

    g.  A laceration requiring 18 staples, as well as other cuts and bruises;

    h.  Separation/tearing of muscles;

    i.  Physical pain, disability, and disfigurement;

    j.  Mental anguish and emotional distress;

    k.  Schrade incurred medical bills;

    l.  Schrade will need future medical treatment and he will incur future medical bills;

    m. Lost wages;

    n.  Loss of enjoyment of life; and

    o.  Permanent injuries and limitations.

63.     Carter's injuries include, but are not limited to:

   a.  Facial fractures;

   b.  Scapula acromion process fracture;

   c.  Torn shoulder tendon;

   d.  A concussion;

   e.  Lacerations that required staples and stitches, as well as other cuts and
       bruises;

   f.  Physical pain, disability, and disfigurement;

   g.  Mental anguish and emotional distress;

   h.  Carter incurred medical bills;

   i.  Carter will need future medical treatment and he will incur future
       medical bills;

   j.  Lost wages;

   k.  Loss of enjoyment of life; and

   l.  Permanent injuries and limitations.

64.     The United States and TVA are liable for Schrade and Carter's injuries
for their wanton and/or reckless actions and inactions. Further, the United States is
liable for the TVA's wanton and/or reckless actions and inactions pursuant to the
doctrines of respondeat superior and/or vicarious liability.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs Schrade Jones and Carter Gilliam demand judgment against the United States of America and Tennessee Valley Authority for:

a)  Actual and compensatory damages arising from the negligent, wanton, and/or reckless actions and inactions of defendants United States of America and Tennessee Valley Authority, either directly or through their respective employees, representatives, or agents;

b)  Costs of this action and permitted reasonable attorneys' fees;

c)  Permitted applicable prejudgment and postjudgment interest;

d)  Such other and further relief as may be permitted by law;

e)  Such other and further relief as the Court deems just and proper under the circumstances.

## **JURY DEMAND**

Plaintiffs Schrade Jones and Carter Gilliam demand judgment trial by jury, to the extent permitted by law.


DATED:    May 13, 2022.


/s/ F. Taylor Rouse
F. Taylor Rouse
Alabama Bar No. AL-8709-R53M

Attorney for Plaintiffs
Cloud, Ryan & Rouse, LLC
525 Madison Street SE, Suite 210
Telephone:  (256) 801-1000
Fax:  (256) 801-0101
Email:  taylor@cloudryanlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

**SCHRADE JONES and CARTER GILLIAM,**

    *Plaintiffs*,

**v.**                             **Case No.**_____

**UNITED STATES OF AMERICA and TENNESSEE VALLEY AUTHORITY,**

    *Defendants*.

---

## CERTIFICATE OF SERVICE
---

I hereby certify that a true and accurate copy of the foregoing complaint has

been served in accordance with the Federal Rules of Civil Procedure upon:

    Attorney General of the United States
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530-0001

    U.S. Department of Justice
    Justice Management Division
    950 Pennsylvania Avenue, NW
    Room 1111
    Washington, DC 20530

    United States Attorney's Office
    Civil Division, Process Clerk
    1801 4th Avenue North
    Birmingham, AL 35203

Tennessee Valley Authority
c/o Jeffrey J. Lyash
Chief Executive Officer
400 West Summit Hill Drive
Knoxville, Tennessee 37902

Tennessee Valley Authority
Office of General Counsel
Attn: David B. Fountain
400 W. Summit Hill Drive
Knoxville, TN 37902

by personal service, hand delivery, and/or placing the same, postage prepaid in the

United States Mail for certified delivery on this 13th day May 2022.

/s/ F. Taylor Rouse
F. Taylor Rouse (AL-8709-R53M)
Attorney for Plaintiffs
Cloud, Ryan & Rouse, LLC
525 Madison Street SE, Suite 210
T:  256-801-1000
F:  256-801-0101
E:  taylor@cloudryanlaw.com